PER CURIAM:
Jenny Milena Garcia (“Garcia”) petitions for review of the Board of Immigration Appeals’ (“BIA”) adoption of the Immigration Judge’s (“IJ”) order of removal and denial of Garcia’s application for asylum and withholding of removal under the Immigration and Nationality Act (“INA”) and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (“CAT”). 8 U.S.C. §§ 1158, 1231(b)(3), 8 C.F.R. § 208.16(c). We deny the petition.
I. BACKGROUND
Garcia, a thirty-two year old native and citizen of Colombia, was admitted to the United States in October 2001 and authorized to remain until 15 April 2002. In August 2002, Garcia applied for asylum pursuant to INA § 208, 8 U.S.C. § 1158, and withholding of removal pursuant to INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), claiming that she would be persecuted by the National Liberation Army (“ELN”) on account of her political opinion or membership in a particular social group if she returned to Colombia. On 3 October 2002, the former Immigration and Naturalization Service[1] issued Garcia a Notice to Appear, charging her with removability under section 237(a)(1)(B) of the INA as an nonimmigrant who remained in the U.S. for a time longer than permitted. In a hearing before the IJ, Garcia conceded removability and renewed her application for asylum and withholding of removal; she also claimed relief under the CAT.
Garcia submitted evidence that the ELN, a Marxist insurgent group operating in certain areas of Colombia, often raised revenue to support their cause by demanding a “war tax” from wealthy people living in the area of Colombia where her family’s cattle farm—for which she assumed responsibility in mid-2000—was located. The ELN is known to steal and destroy property, as well as to kidnap and kill people, for failure to pay the war tax or a ransom demanded. Garcia indicated that her own uncle and a close friend and neighbor had been kidnapped by the ELN.
The record shows that, after Garcia took over her family’s cattle operation, the ELN demanded that she pay them a large sum of money, which she refused to do. She also attempted to organize neighboring ranchers to join her efforts in improving regional security. At one point, she requested assistance from the GAULA Organization, an anti-kidnapping task force set up by the Colombian police and military. Garcia testified that, beginning in 2000, she began receiving phone calls from *857 ELN members threatening her and her family’s lives for her refusal to pay the war tax and her efforts to improve regional security by requesting military assistance. On 27 August 2001, arsonists set fire to a barn housing cattle located near the family’s home while Garcia was present with her uncle. During the disturbance, she heard gunshots and people moving near the house. Shortly after the incident, ELN guerillas called Garcia, stating that the fire was intended to show her what happened to people who refused to pay the war tax.
The day after the fire, Garcia left the ranch to stay with her parents and sister in Barranquilla, Colombia. She then traveled to Jamaica on vacation and later decided to continue to the U.S. After arriving in the U.S., she contacted her family and learned that the situation around the ranch had not improved. She also learned that a close friend and neighbor was captured by the ELN and released only when ransomed. She testified that she feared that the same fate awaited her back in Colombia, stating that conditions in Colombia remain “terrible.”
Although the IJ found Garcia’s testimony credible and accepted that she had a legitimate fear of returning to Colombia, he denied her claims for relief and ordered her removal. The IJ found that the ELN threatened Garcia because she refused to pay the war tax, not because of a protected ground. The IJ specifically concluded that Garcia failed to show that the “ELN attribut[ed] any type of political opinion to [her] by virtue of [her] failure to pay the taxes,” and also stated that “[t]he mere refusal to provide monies to the ... guerillas does not necessarily mean that [Garcia was] being singled out by them as a supporter of the government.” In addition, the IJ rejected Garcia’s claim of persecution on account of her membership in a particular social group, noting that the lack of evidence showing that her family— who has continued to operate the farm— has been threatened since her departure “indicate[s] that the guerrillas are not interested in them as a particular social group but were only interested earlier in ... obtaining] money from individuals that they thought were able to pay.” Finally, the IJ determined that Garcia was ineligible for protection under the CAT because she failed to show that she was the victim of past torture by the Colombian government or by persons acting with the consent or acquiescence of the Colombian government. On appeal, the BIA adopted and affirmed the IJ’s order without an opinion.
II. STANDARD OF REVIEW
In cases of express adoption of the IJ’s decision, we review the IJ’s decision as if it were the BIA’s. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). We review the IJ’s factual determinations on Garcia’s claims under the substantial evidence standard and, therefore, must uphold such findings if they are “supported by reasonable, substantial, and probative evidence on the record as a whole.” INS v. Elias-Zacarias, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992). In other words, we will “affirm the IJ’s decision unless the evidence ‘compels’ a reasonable fact finder to find otherwise.” Sepulveda v. U.S. Att’y Gen., 401 F.3d 1226, 1230 (11th Cir.2005) (quoting Elias, 502 U.S. at 481 n. 1, 112 S.Ct. at 815 n. 1). We review the IJ’s legal conclusions de novo, but will defer to his interpretation of the INA if it is reasonable. Brooks v. Ashcroft, 283 F.3d 1268, 1272 (11th Cir.2002).
III. DISCUSSION
Garcia argues that the IJ erred in concluding that she failed to establish a nexus between her past persecution or well- *858 founded fear of future persecution and her membership in a particular social group or imputed political opinion. She asserts that the IJ erroneously failed to recognize that she was threatened because she was a member of the educated, landowning class of cattle farmers regularly targeted by guerrillas in Colombia, which the Seventh Circuit has found to be a protected group for purposes of asylum. See Orejuela v. Gonzales, 423 F.3d 666, 673 (7th Cir.2005). She also contends that the record shows that the ELN may have construed her acts as a disapproval of their efforts and goals and that this evidence sufficiently establishes persecution because of an imputed political opinion. And, Garcia argues that the IJ abused his discretion by denying her relief under the CAT. We cannot agree, and we address each of Garcia’s claims in turn.

A. Asylum under INA § 208

Section 208 of the INA, 8 U.S.C. § 1158, vests DHS and the Attorney General with discretion to grant asylum to “refugees,” or persons who are unable or unwilling to return to their country “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, or membership in a particular social group, or political opinion.” INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). An asylum applicant must demonstrate— by credible and specific evidence—either (1) past persecution on account of a statutorily listed factor, or (2) a well-founded fear that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). An applicant may establish a “well-founded fear” of future persecution by demonstrating these things: (1) she fears persecution based on an enumerated ground; (2) there is a reasonable possibility that she will suffer persecution if removed to her native country; (3) she is unable or unwilling to return to her native country because of her fear; and (4) her fear of persecution is subjectively genuine and objectively reasonable. See 8 C.F.R. § 208.13(b)(2)©; Al Najjar, 257 F.3d at 1289. In considering an asylum application, the IJ should consider whether the applicant could avoid persecution by relocating to another area within her native country. 8 C.F R. § 208.13(b)(3).
Substantial evidence supports the IJ’s determination that Garcia was not persecuted and does not fear future persecution “on account of’ her membership in a particular social group. In reaching this conclusion, we find it unnecessary to decide whether educated, landowning cattle ranchers in Colombia—the relevant social group as defined by Garcia—is a protected group, although we note that at least two other circuits have said that prominent landowners may constitute a protected class within Colombia. See Orejuela v. Gonzales, 423 F.3d 666, 672 (7th Cir.2005) (granting asylum to Colombian family which fell “into a distinct social group: the educated, landowning class of cattle farmers targeted by FARC,” another communist guerrilla group operating in Colombia); Ramirez v. Att’y Gen., 187 Fed.Appx. 228, 230-31 (3rd Cir.2006) (unpublished) (noting that targeting of asylum applicant by FARC “because of his status as a businessman and landowner ... could constitute the type of ‘immutable characteristic’ that would make up a ‘particular social group’ under the BIA’s definition of that term”). Although these decisions are not binding on this Court, they are instructive and are not inconsistent with our conclusion. In both Orejuela and Ramirez, the guerrillas specifically communicated that their threats and demands were made on the aliens because they were educated and landowners. See Orejuela, 423 F.3d at 672 (noting that one family member “was told by the FARC guerillas that [the threats *859 were] because his family belonged to a ‘privileged group’ and that he and his brothers had gone to schools and universities; ... [and] because his father was ‘renowned’ as a cattle rancher”); Ramirez, 187 Fed.Appx. at 229 (referring to a letter from FARC demanding money from applicant that stated, “We are aware that your properties and businesses are located in our areas of operations. Because of this, it is necessary to undertake some form of collaboration.... ”).
But, in this case, the specific evidence Garcia presented does not indicate that the ELN targeted her—or will do so in the future—because she was an educated landowner; the reason given for the ELN’s threats was her refusal to pay the war tax. As noted by the IJ, the lack of evidence showing that her family has been harmed or threatened since she left Colombia supports this finding. Nothing in the record compels the conclusion that the ELN targeted her for a reason other than her perceived ability to pay the tax. As noted by the Seventh Circuit, a group defined solely by their wealth is insufficiently narrow to constitute a protected class for asylum purposes. Orejuela, 423 F.3d at 672 (citing In re V-T-S, 21 I. & N. Dec. 792, 799 (BIA 1997)). Thus, the IJ did not err by rejecting Garcia’s asylum claim based on her membership in a particular social group.
Substantial evidence also supports the IJ’s determination that Garcia failed to show that the ELN persecuted her or that she fears future persecution because of her political opinion. To qualify for asylum based on the political opinion ground, an applicant must show “ ‘persecution on account of the victim’s political opinion, not the persecutors.’ ” Sanchez v. U.S. Att’y Gen., 392 F.3d 434, 437-38 (11th Cir.2004) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992)). Although a political opinion may be mistakenly “imputed” to the applicant by the persecutor, see Al Najjar v. Ashcroft, 257 F.3d 1262, 1289 (11th Cir. 2001), there must be some evidence that politics, rather than other likely reasons, motivated the alien’s resistance to the persecutor. Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815-16. Here, Garcia’s testimony that she reported ELN activity to an anti-kidnapping group and attempted to improve regional security is consistent with her imputed political claim, but such evidence does not compel this Court to conclude that the IJ erred.
Garcia introduced no specific evidence showing that her refusal to pay the war tax and other efforts against the ELN stemmed in part from a political opinion or that the ELN ever attributed a political opinion to her based on her acts. As we have previously determined, refusal to cooperate with or to support guerillas financially is insufficient to show persecution on account of a political opinion. Sanchez, 392 F.3d at 438; see also Elias-Zacarias, 502 U.S. at 482, 112 S.Ct. at 815-16 (guerilla organization’s efforts to recruit alien into its military forces did not constitute persecution on account of a political opinion, and resistance to recruitment did not show, in itself, political motive on the alien’s part). The evidence suggests that the ELN will persecute Garcia because of her refusal to pay a war tax. This persecution does not compel a finding of persecution on account of a political opinion; we therefore affirm the IJ’s denial of asylum.

B. Withholding of Removal under IN A § 2fl

Section 241(b)(3)(A) of the INA, 8 U.S.C. § 1231(b)(3)(A), entitles an alien to withholding of removal if she can show that her “life or freedom would be threatened” on account of an enumerated ground. To meet this standard, an appli *860 cant must show that it is “more likely than not” she will be persecuted or tortured upon return to her country. Sepulveda v. U.S. Att’y Gen., 401 F.3d 1226, 1232 (11th Cir.2005). Because the standard for withholding of removal is more stringent than the “well-founded fear” standard for establishing asylum, failure to qualify for asylum generally forecloses eligibility for withholding of removal. Al Najjar v. Ashcroft, 257 F.3d 1262, 1292-93 (11th Cir. 2001). Because Garcia failed to establish her eligibility for asylum, the IJ correctly denied her application for withholding of removal under INA § 241(b)(3).

C. Withholding of Removal under the CAT

To obtain withholding of removal under the CAT, an applicant must show that it is “more likely than not” that she will be tortured in the country of removal. 8 C.F.R. § 208.16(e)(2). For purposes of CAT relief, “torture” refers to “any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person ... by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.” Id. § 208.18(a)(1). Acquiescence of a public official “requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity.” Reyes-Sanchez v. U.S. Att’y Gen., 369 F.3d 1239, 1242 (11th Cir.2004) (quoting 8 C.F.R. § 208.18(a)(7)). Garcia did not claim potential torture on the part of the Colombian government or its agents, nor did she provide evidence that the Colombian government has or will breach its legal responsibility to intervene in or prevent the ELN’s activities. Thus, the IJ correctly determined that her claim for withholding of removal under the CAT must fail.
IV. CONCLUSION
We are guided by Elias-Zacarias and Sanchez, the factual weakness of the record, and the standard of review. Substantial evidence supports the IJ’s finding that Garcia is ineligible for asylum because she failed to establish a nexus between her past persecution or well-founded fear of future persecution and her membership in a particular social group or a political opinion. The record sufficiently supports the IJ’s conclusion that the ELN targeted Garcia because she refused to pay a war tax, not because she belonged to a particular social group or because of her political opinion, actual or imputed. Although Garcia provided some support for her position, her evidence does not compel us to conclude the IJ erred. In addition, Garcia failed to establish eligibility for withholding of removal pursuant to the INA and the CAT. Accordingly, Garcia’s petition for review of the removal order is
DENIED.

. On 25 November 2002, President Bush signed the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2125 (2002), which created a new Department of Homeland Security (“DHS”), abolished the INS, and transferred the INS’s functions to the new department.